**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

ROBERT MAININI, on behalf of himself and others similarly situated,

Plaintiff,

v.

HEALTH MATCHING ACCOUNT SERVICES, INC.; ELLIOTT GOROG; REGINA GOROG; GEOFF KIRK; REGINA KATHRYN GOROG, AS TRUSTEE OF THE REGINA KATHRYN GOROG TRUST; ELLIOTT CLIFFORD GOROG, AS TRUSTEE OF THE ELLIOTT CLIFFORD GOROG TRUST; GARLAND LEVIT, AS TRUSTEE OF THE GARLAND LEVIT 2011 IRREVOCABLE TRUST; GARLAND LEVIT, AS TRUSTEE OF THE DONALD N. LEVIT 2010 DESCENDANTS TRUST; GARLAND LEVIT, INDIVIDUALLY; DONALD LEVIT, INDIVIDUALLY; INVESTMENTS OF MOTHER & SON, LLC; THINK WELLNESS NOW, INC.; HEALTH MAINTENANCE PLUS AGENCY, INC., PET HEALTH MATCHING ACCOUNT SERVICES, INC., AGENTS COMMISSON ADVANCE ASSOCIATION, LLC, JOHN DOE DEFENDANTS 1-10,

Defendants

No: 25-cv-5381

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiff Robert Mainini ("Plaintiff"), by and through his undersigned counsel, individually and on behalf of others similarly situated, brings this action for damages and equitable relief against Health Matching Account Services, Inc. ("HMA"), Elliott Gorog,

Regina Gorog, Geoff Kirk, Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust, Garland Levit individually, Donald Levit individually, Investments of Mother and Son, LLC, Think Wellness Now, Inc.; Health Maintenance Plus Agency, Inc., Pet Health Matching Account Services, Inc.., Agents Commission Advance Association, LLC, and John Doe Defendants 1-10 (collectively, "Defendants") and states as follows:

Alexander Loftus, Esq.
SDTX Federal No. 3663102
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60601
Ph: 312.899.6625
alex@loftusandeisenberg.com
- and -

James Crewse, Esq.
Texas Bar No. 24045722
CREWSE LAW FIRM, PLLC
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com

*ATTORNEYS FOR PLAINTIFF*
*AND THE PROPOSED CLASS*

## TABLE OF CONTENTS


I. NATURE OF ACTION ..... 1

II. JURISDICTION AND VENUE ..... 3

III. PARTIES ..... 3

A. Plaintiff ..... 3

B. Defendants ..... 4

IV. FACTUAL ALLEGATIONS ..... 9

A. CHRONOLOGICAL TIMELINE OF KEY EVENTS ..... 9

B. HMA'S FRAUDULENT BUSINESS MODEL ..... 10

C. WHO COMMITTED THIS FRAUD ..... 12

i. Regina Gorog: The Architect and Ultimate Controller ..... 12

ii. Elliott Gorog: The Public Face and Fraud Implementer ..... 13

iii. Geoff Kirk: Manager and Coordinator of Customer Deception ..... 14

iv. The Beneficial Owners: Garland Levit and Donald Levit ..... 15

D. SPECIFIC DECEPTIVE ACTS ..... 16

i. False Representations About Matching Funds ..... 16

ii. False Representations About Fund Accessibility ..... 17

iii. False Statements Regarding Claim Payment Status (by Geoff Kirk) ..... 18

iv. False Representations in "Important Notice" (by Regina Gorog) ..... 19

E. THE PONZI SCHEME STRUCTURE AND DOCUMENTED INSOLVENCY ..... 19

F. SYSTEMATIC FRAUDULENT TRANSFERS ..... 21

i. Daily Transfers Documented by Hollie Shelton ..... 21

ii. Transfers for Personal Benefit of Regina Gorog and Elliott Gorog ..... 22

iii. Transfers to Trust Defendants and Related Entities ..... 23

G. DAMAGES TO CLASS MEMBERS ..... 24

V. CLASS ACTION ALLEGATIONS ..... 25

VI. CAUSES OF ACTION ..... 27

COUNT 1: BREACH OF CONTRACT (On Behalf of Plaintiff and the Class v. HMA) ..... 27

COUNT 2: TEXAS DECEPTIVE TRADE PRACTICES ACT (On Behalf of Plaintiff and the Class v. HMA, Elliott Gorog, Regina Gorog, and Geoff Kirk) ..... 28

6FRAUDULENT TRANSFER – ACTUAL FRAUD UNDER TUFTA § 24.005(a)(1) (On Behalf of Plaintiff and the Class v. Regina Gorog, Elliott Gorog, Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust, Garland Levit individually, Donald Levit individually, Investments of Mother and Son LLC, Think Wellness Now Inc., Geoff Kirk, Health Maintenance Plus Agency, Inc., Pet Health Matching Account Services, Inc.., Agents Commission Advance Association, LLC, and John Doe Defendants 1-10) ..... 36

COUNT 4: FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD UNDER TUFTA §§ 24.005(a)(2) AND 24.006 (On Behalf of Plaintiff and the Class v. Regina Gorog, Elliott Gorog, Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust, Garland Levit individually, Donald Levit individually, Investments of Mother and Son LLC, Think Wellness Now Inc., Geoff Kirk, Health Maintenance Plus Agency, Inc., Pet Health Matching Account Services, Inc.., Agents Commission Advance Association, LLC, and John Doe Defendants 1-10) ..... 45

COUNT 5: VEIL PIERCING/ALTER EGO (On Behalf of Plaintiff and the Class v. Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust) ..... 46

COUNT 6: VEIL PIERCING: OFFICER LIABILITY UNDER TEXAS BUS. ORGS. CODE § 21.223(b) (On Behalf of Plaintiff and the Class v. Elliott Gorog, Regina Gorog, and Garland Levit) ..... 48

COUNT 7: CONSTRUCTIVE TRUST (On Behalf of Plaintiff and the Class v. All Defendants) ........ 46

VII. PRAYER FOR RELIEF ........ 61

VIII. DEMAND FOR JURY TRIAL ........ 64

## I.
## NATURE OF ACTION

1. This action seeks redress for a massive consumer fraud perpetrated by Defendants through their operation of a health savings account scheme that systematically defrauded thousands of consumers nationwide.

2. Through internal communications and witness testimony, Defendants' own words reveal the fraudulent nature of their enterprise. As Elliott Gorog admitted in a text message sent on December 9, 2023: "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don."

3. This case also seeks to recover fraudulent transfers made from HMA to insiders, beneficial owners, and related entities while HMA was insolvent and operating as an admitted Ponzi scheme, and to pierce the corporate veil to hold the beneficial owners of HMA personally liable for the fraud perpetrated through the corporate entity they controlled as mere instrumentalities.

4. The scale of this fraud is staggering. As revealed in the United States' civil enforcement action filed in the Western District of Missouri (Case No. 4:25-00814-CV-W-RK), on October 1, 2023, HMA reported member account balances totaling $33,034,560.42 among 8,537 active members, but HMA's actual bank account balance at PlainsCapital Bank (Account No. ending in 8956) was only $130,609.20—representing less than 0.4% of what it owed to members and a shortfall of $32,903,951.22.

5. Between October 2023 and February 2024, HMA continued recruiting new members while maintaining this massive disparity between reported account balances and actual funds on hand, as documented in HMA's own financial records:

| Date | Total Cash | Reported Obligations | Active Members | Shortfall |
|---|---|---|---|---|
| 10/01/2023 | $130,609 | $33,034,560 | 8,537 | $32,903,951 (99.6%) |
| 11/22/2023 | $990,721 | $35,820,212 | 8,827 | $34,829,491 (97.2%) |
| 12/01/2023 | $1,104,326 | $36,278,020 | 9,028 | $35,173,694 (97.0%) |
| 01/01/2024 | $1,183,795 | $37,824,179 | 9,155 | $36,640,384 (96.9%) |
| 02/01/2024 | $1,401,769 | $38,882,626 | 9,390 | $37,480,857 (96.4%) |

6. Defendants systematically transferred customer funds out of HMA's operating accounts. Former employee Hollie Shelton, in sworn testimony given in August 2024, documented daily transfers of substantial customer funds from HMA's accounts to separate accounts at PlainsCapital Bank through Stripe payment processing accounts, testifying: "I would see it like every single day, you know, it'd be like $50,000 from a payout for health matching account, services to this bank account. You know, $27,000.40 $46,000 like these are daily transactions."

7. HMA is wholly owned by four trusts controlled by the Gorog family and the Levit family, who co-founded HMA and have used these trusts as conduits to receive fraudulent transfers of customer funds while attempting to shield themselves from liability. As disclosed in HMA's Rule 7.1 Disclosure Statement filed December 17, 2024, HMA is wholly owned by: (a) Regina Kathryn Gorog, as Trustee of the Regina Kathryn Gorog Trust; (b) Elliott Clifford Gorog, as Trustee of the Elliott Clifford Gorog Trust; (c) Garland Levit, as Trustee of the Garland Levit 2011 Irrevocable Trust; and (d) Garland Levit, as Trustee of the Donald N. Levit 2010 Descendants Trust.

8. Upon information and belief, additional individuals and entities, including financial institutions that processed the systematic daily transfers and professional advisors who structured the ownership and assisted in concealing assets, facilitated or benefited from the fraudulent scheme. These are identified as John Doe Defendants 1-10 and may be added by amendment.

## II.
## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because: (a) at least one member of the proposed class is a citizen of a state different from Defendants; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) there are more than 100 members of the proposed class.

10. This Court has personal jurisdiction over Defendants because they are residents of Texas, maintain their principal place of business in Texas, and/or conducted substantial business activities in Texas that form the basis of this action.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District, a substantial part of the events giving rise to the claims occurred in this District (including fraudulent transfers, operational decisions, and misrepresentations), and Defendants conducted substantial business in this District.

## III.
## PARTIES

### A. Plaintiff

12. Plaintiff Robert Mainini is a citizen and resident of Arizona. Mr. Mainini enrolled in HMA's health matching account program in 2022 after being contacted by an HMA-affiliated insurance broker. Mr. Mainini entered into a Primary Holder Contract with HMA, which was signed by Regina Gorog as HMA's President. (Contract attached hereto as Exhibit "A") Mr. Mainini made monthly contributions to his account in reliance on HMA's specific

promises to: (a) match his contributions dollar-for-dollar up to a specified cap, thereby doubling his account value; (b) maintain his funds in an accessible account for medical expenses; and (c) provide debit card or other ready access to his funds for qualified medical expenses as defined in 26 U.S.C. § 213(d).

**B. Defendants**

13. Defendant Health Matching Account Services, Inc. ("HMA"), is a Texas corporation with its principal place of business located in Houston, Harris County, Texas. Its officers Regina Gorog, Regina Gorog, and Garland Levit. HMA operates what it markets as a health savings account-like program throughout the United States. HMA maintains multiple bank accounts at PlainsCapital Bank in Texas, including Account No. ending in 8956 (the primary member contributions account), and processes payments through Stripe payment processing accounts.

14. Defendant, Elliott Gorog, is an individual who at all relevant times was a principal, officer, director, and/or authorized signatory of HMA and a resident of Houston, Texas. Elliott Gorog is responsible for sales and marketing of HMA's products and is the son of Regina Gorog. Elliott Gorog is an authorized signatory on HMA's PlainsCapital Bank Account No. ending in 8956, giving him direct control over customer funds. Elliott Gorog designed and implemented the fraudulent "pocket the savings" scheme and personally directed customer service representatives to make false statements to customers regarding claim status.

15. Defendant, Regina Gorog, is an individual who at all relevant times was a principal, officer, president, director, and/or authorized signatory of HMA and a resident of Houston, Texas. Regina Gorog is the mother of Elliott Gorog and holds final approval authority on HMA's claims approval and denial. Regina Gorog is the sole authorized signatory on HMA's primary PlainsCapital Bank Account No. ending in 8956 and manages all of HMA's financial

accounts. Regina Gorog exercises ultimate control over all financial decisions at HMA, including which customers receive payments and which do not.

16. Defendant, Geoff Kirk, is an individual who at all relevant times was a manager and/or supervisor at HMA with responsibilities for claims processing and customer service operations, and is a resident of Texas. Kirk was directly involved in the systematic deception of customers regarding claim payment status and actively participated in the fraudulent claims processing scheme by instructing customer service representatives to tell customers that claims checks had been sent when the checks remained physically present and unsent in HMA's office.

17. Defendant, Regina Kathryn Gorog, as Trustee of the Regina Kathryn Gorog Trust (the "Regina Gorog Trust"), is a beneficial owner of HMA holding an ownership interest. The Regina Gorog Trust is a Texas trust created under Texas law with its principal place of administration in Texas. Regina Gorog, as Trustee, exercises control over HMA through her ownership interest and, upon information and belief, is also a beneficiary of the trust. Regina Gorog as trustee had actual knowledge of HMA's insolvency and fraudulent operations at the time of such transfers.

18. Defendant Elliott Clifford Gorog, as Trustee of the Elliott Clifford Gorog Trust (the "Elliott Gorog Trust"), is a beneficial owner of HMA holding an ownership interest. The Elliott Gorog Trust is a Texas trust created under Texas law with its principal place of administration in Texas. Elliott Gorog, as Trustee, exercises control over HMA through his ownership interest and, upon information and belief, is also a beneficiary of the trust. Elliott Gorog as trustee had actual knowledge of HMA's insolvency and fraudulent operations at the time of such transfers, as evidenced by his December 9, 2023 text message admitting HMA was a "Ponzi scheme."

19. Defendant Garland Levit, as Trustee of the Garland Levit 2011 Irrevocable Trust (the "Garland Levit Trust"), is a beneficial owner of HMA holding an ownership interest.

The Garland Levit Trust is a Texas trust created under Texas law with its principal place of administration in Texas. Garland Levit, as Trustee, exercises control over HMA through his ownership interest. The trust has received distributions and transfers from HMA while HMA was insolvent.

20. Defendant Garland Levit, as Trustee of the Donald N. Levit 2010 Descendants Trust (the "Donald Levit Descendants Trust"), is a beneficial owner of HMA holding an ownership interest. The Donald Levit Descendants Trust is a Texas trust created under Texas law with its principal place of administration in Texas. Garland Levit, as Trustee, exercises control over HMA through his ownership interest. The trust has received distributions and transfers from HMA while HMA was insolvent.

21. Defendant Garland Levit, individually, is a resident of Texas who, along with Donald Levit and Regina Gorog, co-founded HMA in or around 2015. Garland Levit serves as trustee of two trusts that collectively own 50% of HMA (the Garland Levit 2011 Irrevocable Trust and the Donald N. Levit 2010 Descendants Trust) and has direct involvement in HMA's operations and management. Upon information and belief, Garland Levit personally received transfers of HMA customer funds for his personal benefit.

22. Defendant Donald Levit ("Don Levit") is a resident of Texas who co-founded HMA with Regina Gorog and Garland Levit in or around 2015. Donald Levit had direct involvement in the creation and operation of HMA's fraudulent business model. Elliott Gorog's December 9, 2023 reference to the "Donzi scheme in loving memory of Don" indicates that the fraudulent nature of HMA's business was understood and intended from Don Levit's involvement in founding the company.

23. Defendant Investments of Mother and Son, LLC is a Texas limited liability company with its principal place of business in Texas. The only member are Elliot Gorog and Regina Gorog with its principal place of business at 5120 Woodway Dr. Suite 10023 and has

received fraudulent transfers from HMA. The entity lacks any independent business purpose separate from serving as a vehicle to receive and hold assets fraudulently transferred from HMA.

24. Defendant Think Wellness Now, Inc. is a Texas corporation with its principal place of business in Texas. The directors are Garland Levitt and Regina Gorog, Elliot Gorog is an officer with the title “marketing” with its principal place of business at 5120 Woodway Dr. Suite 10023 and has received fraudulent transfers from HMA. and has received fraudulent transfers from HMA. The entity lacks any independent business purpose separate from serving as a vehicle to receive and hold assets fraudulently transferred from HMA.

25. Defendant, Health Maintenance Plus Agency, Inc., is a Texas corporation with its principal place of business in Texas. The directors are Garland Levitt and Elliot Gorog, with its principal place of business at 5120 Woodway Dr. Suite 10023 and has received fraudulent transfers from HMA. and has received fraudulent transfers from HMA. The entity lacks any independent business purpose separate from serving as a vehicle to receive and hold assets fraudulently transferred from HMA.

26. Defendant, Agents Commission Advance Association, LLC, is a Texas limited liability company with its principal place of business in Texas. The only members are Elliot Gorog, Regina Gorog, and Garland Levit with its principal place of business at 5120 Woodway Dr. Suite 10023 and has received fraudulent transfers from HMA. The entity lacks any independent business purpose separate from serving as a vehicle to receive and hold assets fraudulently transferred from HMA.

27. Pet Health Matching Account Services, Inc. is a Texas corporation with its principal place of business in Texas. The directors are Garland Levitt and Regina Gorog, Elliot Gorog is an officer with the title “marketing” with its principal place of business at 5120 Woodway Dr. Suite 10023.

28. Defendants John Doe 1-10 are individuals and entities whose identities are presently unknown to Plaintiff but who, upon information and belief, assisted in, facilitated, or benefited from the fraudulent scheme. Upon information and belief, John Doe Defendants include:

a) Financial institutions who processed, facilitated, or failed to report suspicious transactions involving the systematic daily transfer of $27,000 to $50,000 in customer funds from HMA's member contribution account to other accounts controlled by insiders;

b) Payment processors that facilitated the systematic daily transfers of customer funds

c) Professional advisors, who assisted in structuring the trust ownership arrangement designed to shield beneficial owners from liability, structured fraudulent transfers, or assisted in concealing assets;

d) Other individuals or entities who knowingly participated in or substantially assisted the fraudulent conduct.

29. Plaintiff will seek leave to amend this Complaint to identify the John Doe Defendants by their true names upon discovery of their identities and specific roles.

# IV.
# FACTUAL ALLEGATIONS

## A. CHRONOLOGICAL TIMELINE OF KEY EVENTS

30. This timeline presents key events in chronological order, establishing when critical representations were made, when transfers occurred, and when HMA's insolvency was documented:

a) 2015: Don Levit, Regina Gorog, and Garland Levit co-found HMA.

b) 2016: HMA launches the Health Matching Account product, promising dollar-for-dollar matching of customer contributions up to specified caps and easy access to funds via debit cards.

c) 2020-2022: HMA continues recruiting customers nationwide using standardized Primary Holder Contracts signed by Regina Gorog as President, promising matching funds and accessible accounts. Each contract includes an "Important Notice" signed by Regina Gorog stating: "Please remember it is in your best interest to make contributions without using your account for as long as possible to allow the excess benefit to work for you and your account will build as projected in the HMA® Account Value Tables."

d) 2022: Plaintiff Robert Mainini enrolls in HMA's program based on representations from HMA-affiliated insurance broker regarding matching funds, accessible accounts, and debit card access.

e) October 10, 2023: HMA sends email to all members announcing transition from debit cards to member ID cards, citing "fraud and abuse" as justification.

f) October 1, 2023: HMA holds $130,609.20 in its PlainsCapital Bank Account No. ending in 8956, while reporting member obligations of $33,034,560.42—a shortfall of $32,903,951.22 (99.6%).

g) October 2023 - February 2024: Hollie Shelton observes and documents daily transfers of $27,000 to $50,000 from HMA's accounts through Stripe to other PlainsCapital Bank accounts controlled by insiders.

h) November 15, 2023: Elliott Gorog sends text message stating: "Our clients average account balance is between seven and $10,000 and every time they called they're very easy to be turned around always like what where are you going to go? Looks like we have to work this out together guys. Lol."

i) November 27, 2023: Elliott Gorog sends text message: "People are starting [to] come at me with pitch forks wanting their bills paid lol."

j) December 9, 2023: Elliott Gorog sends text message admitting: "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don."

k) January 12, 2024: Elliott Gorog sends text message stating he is lying to brokers about HMA's plans to bring back debit cards when no such plans exist.

l) January 29, 2024: Elliott Gorog again references HMA as a "Donzi scheme."

m) February 16, 2024: Elliott Gorog sends text message referring to HMA as a "scam."

n) February 1, 2024: HMA holds $1,401,769.18 in cash while reporting member obligations of $38,882,625.83—a shortfall of $37,480,856.65 (96.4%).

o) December 17, 2024: HMA files Rule 7.1 Disclosure Statement confirming ownership by four trusts controlled by the Gorog and Levit families.

p) August 2025: Hollie Shelton blows the whistle regarding HMA's fraudulent operations, daily transfers, and systematic customer deception.

**B. HMA'S FRAUDULENT BUSINESS MODEL**

31. HMA marketed a product called a "Health Matching Account," structured similarly to a Health Savings Account but funded with post-tax dollars, eliminating the actual need for strict § 213(d) compliance that HMA imposed.

32. The central sales pitch to consumers was that, in exchange for paying monthly fees and making monthly contributions over 35 months, consumers' account values would double through HMA's dollar-for-dollar matching, and funds would be accessible for medical expenses via debit card.

33. HMA marketed various "products" (HMA 10000, HMA 20000, HMA 40000, HMA 50000, HMA 60000), each requiring different monthly contribution amounts and promising different final account balances after matching. These products were marketed through written materials distributed to insurance brokers and agents nationwide, including detailed "HMA® Account Value Tables" showing projected account growth.

34. The HMA® Account Value Tables, attached as Exhibit 1 to each Primary Holder Contract, showed for each product: (a) the contribution month; (b) total contribution required; and (c) the promised account balance after HMA's matching. For example, the HMA 50000 product table showed that after 35 months of contributions totaling $21,175, the account balance would reach $50,000 through HMA's matching.

35. Each Primary Holder Contract included an "Important Notice" signed by Regina Gorog as HMA's President, dated as of the contract execution date, which stated: "Please remember it is in your best interest to make contributions without using your account for as long as possible to allow the excess benefit to work for you and your account will build as projected in the HMA® Account Value Tables at the end of this Agreement."

36. The contracts, signed by Regina Gorog as President, defined specific "services" that HMA would provide, including:

a) Maintenance of the Primary's contributions in a contribution account with records showing account balance accessible through web portal or mobile app;

b) Application of a "multiplier" to the Primary's contribution account as illustrated in the HMA® Account Value Tables;

c) Determination of whether claims are "Eligible Expenses" and debiting claim amounts from the Primary's contribution account;

d) Maintenance of a website for viewing account balances;

e) Preparation and distribution of Explanations of Benefits (EOBs);

f) Handling of inquiries related to membership, benefits, and claim payment or denial;

g) Customer service telephone support;

h) Processing and payment of medical claims from the customer's account.

37. These specifically enumerated services constitute "services" under the DTPA that were purchased by customers for personal, family, and household use— specifically, to pay for their own and their families' medical expenses.

**C. WHO COMMITTED THIS FRAUD**

**i. Regina Gorog: The Architect and Ultimate Controller**

38. Regina Gorog conceived, directed, and controlled the fraudulent operations of HMA, serving as President and holding final approval authority on all significant decisions.

39. As Elliott Gorog stated in internal communications: "My mom rewrote the pimp game in the PBM space lol!"—directly attributing the fraudulent business model to Regina Gorog.

40. Regina Gorog signed each Primary Holder Contract as HMA's President, including the "Important Notice" making specific promises about matching funds and account growth that she knew were false.

41. Regina Gorog was the sole authorized signatory on HMA's primary PlainsCapital Bank Account No. ending in 8956, giving her exclusive control over the account receiving all customer contributions.

42. Former employee Hollie Shelton confirmed Regina Gorog's ultimate control, stating that: "when Regina came in, if Regina felt like it, then they would make a check run"—demonstrating that claim payments were made arbitrarily based on Regina's whim rather than contractual obligation.

43. Regina Gorog personally decided which customers would receive payments and which would not, and which account balances would be arbitrarily adjusted to silence complaints.

44. Regina Gorog implemented policies designed to prevent customers from accessing their funds. As Elliott Gorog stated: "My mom is so mad that the clients are trying to interact between the doctor and the hospital and getting paid. She's putting in the hma contract that they're not allowed to do that or we will fire them. Lol."

45. Elliott Gorog described his mother as wanting to "rape and pillage," stating: "I'm trying to tell Griselda a.k.a. my mom it's OK mom we don't have to rape and pillage all the time lol."

46. Regina Gorog knew that customer funds were commingled rather than properly segregated, as evidenced by Hollie Shelton's testimony describing "slush accounts" where no individual customer funds were properly set aside.

47. Regina Gorog controlled access to and movement of funds in HMA's accounts, enabling the systematic daily diversion of $27,000 to $50,000 in customer funds to other accounts.

### ii. Elliott Gorog: The Public Face and Fraud Implementer

48. Elliott Gorog served as HMA's sales and marketing director, responsible for recruiting insurance brokers, agents, and customers into the fraudulent scheme.

49. Elliott Gorog is an authorized signatory on HMA's PlainsCapital Bank Account No. ending in 8956.

50. Elliott Gorog explicitly admitted HMA was a Ponzi scheme in his December 9, 2023 text message: "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don."

51. On February 16, 2024, Elliott Gorog referred to HMA as a "scam" in internal text communications.

52. Elliott Gorog designed and implemented the "pocket the savings" scheme, explicitly stating: "we're going to charge members account balances the unadjudicated amount and pocket the savings."

53. Elliott Gorog celebrated the systematic reduction in claims payments to providers, bragging: "Before phil my claims were 30k a day now they are 7k lol"—a 77% reduction achieved through fraud.

54. Elliott Gorog gave explicit instructions to defraud healthcare providers, instructing staff to: "stiff the hospital and wipe out the HMA account balances!! Lol 😂😂"

55. Elliott Gorog bragged about destroying legitimate claims, stating: "I'm almost done with the audit I promised Mommy last Friday, which was a MUST. I tossed at least 30 claims in the trash."

56. On November 15, 2023, Elliott Gorog described HMA as the "stickiest product known to man," explaining: "Our clients average account balance is between seven and $10,000 and every time they called they're very easy to be turned around always like what where are you going to go? Looks like we have to work this out together guys. Lol."

57. On January 12, 2024, Elliott Gorog stated he was lying to brokers about HMA's plans to bring back debit cards when no such plans existed.

58. Elliott Gorog used proceeds from the fraud to fund personal expenses including cocaine, food, entertainment, and rent on a beachfront condominium he maintained with Regina Gorog for substantial personal use.

**iii. Geoff Kirk: Manager and Coordinator of Customer Deception**

59. Geoff Kirk served as a manager at HMA with direct supervisory responsibility over customer service representatives and claims processing.

60. Kirk coordinated the systematic deception of customers regarding claim payment status, working directly with Regina Gorog on these deceptive practices.

61. As Hollie Shelton stated: "There would be stacks of checks. He [Geoff Kirk] would check, and he'd be like, it's right here. Tell him that it tell him it's went out yet. Tell him it's already went out."

62. Kirk knew that claims had not been paid but specifically instructed customer service representatives to lie to customers and tell them payments had been sent.

63. Kirk's active participation in the systematic customer deception was essential to maintaining the fraud by preventing customers from discovering that their claims were not being processed as promised.

**iv. The Beneficial Owners: Garland Levit and Donald Levit**

64. Garland Levit and Donald Levit co-founded HMA with Regina Gorog in or around 2015.

65. Garland Levit and Donald Levit are listed as inventors of the HMA system employed, patent No US 8,510,135 BI.

66. Garland Levit serves as trustee of both the Garland Levit 2011 Irrevocable Trust and the Donald N. Levit 2010 Descendants Trust, which together own 50% of HMA.

67. Upon information and belief, Garland Levit and Donald Levit, directly and through entities they control (Investments of Mother and Son, LLC and Think Wellness Now, Inc.), received substantial transfers of customer funds from HMA while HMA was insolvent.

68. Elliott Gorog's December 9, 2023 reference to the "Donzi scheme in loving memory of Don" indicates that Don Levit's role in founding the company included designing or approving the fraudulent business model.

**D. SPECIFIC DECEPTIVE ACTS**

**i. False Representations About Matching Funds**

69. Between 2016 and 2024, Elliott Gorog, acting as HMA's marketing director, made specific representations to insurance brokers and agents nationwide (including the broker who recruited Plaintiff Mainini in 2022) that HMA would "match" customer contributions dollar-for-dollar up to specified caps, thereby doubling account values.

70. These representations were made through: (a) written marketing materials distributed to insurance brokers bearing HMA's logo and Elliott Gorog's contact information; (b) in-person and virtual presentations to insurance agents; (c) the HMA website at healthmatchingaccounts.com; and (d) broker training materials describing the matching program.

71. Regina Gorog made the same representations through: (a) signing each Primary Holder Contract as President, which incorporated by reference the "HMA® Account Value Tables" showing projected account growth through matching; and (b) signing the "Important Notice" in each contract stating accounts would "build as projected in the HMA® Account Value Tables."

72. These representations were false when made because, as ClaimChoice CEO Phil Burghardt confirmed on October 7, 2024: "All matching was phantom and money never actually was added to client accounts as promised."

73. The representations were false when made because, as Hollie Shelton testified in August 2024: "the money in their account technically doesn't exist. It's just a number on your account, like there's no money actually associated with your specific account."

74. Elliott Gorog and Regina Gorog knew these representations were false at the time they made them, as evidenced by: (a) Elliott's December 9, 2023 admission that HMA was a "Ponzi scheme"; (b) the documented insolvency showing HMA held less than 1% of reported balances on October 1, 2023; and (c) Regina's control over HMA's financial accounts revealing she knew no matching funds were being set aside.

**ii. False Representations About Fund Accessibility**

75. On October 10, 2023, HMA sent an email from customercare@ healthmatchingaccounts.com to all members announcing the transition from debit cards to member ID cards, representing that this change was due to "fraud and abuse of debit cards."

76. This representation was false because the actual reason for eliminating debit cards was to give HMA complete control over claims payment, allowing HMA to deny or delay legitimate claims. The timing coincided precisely with HMA's documented crisis-level insolvency (holding only $130,609.20 against obligations of $33,034,560.42 on October 1, 2023).

77. Prior to October 2023, Elliott Gorog made representations to customers through marketing materials and contracts that customers would have "easy access" to their funds through debit cards for medical expenses.

78. These representations were false or became false when, in October 2023, HMA eliminated debit card access and implemented a system requiring providers to submit claims to HMA's third-party administrator, knowing that many providers would refuse to work with HMA (a non-insurance company) and that HMA would deny or delay payment of submitted claims.

79. On January 12, 2024, Elliott Gorog admitted in a text message that he was lying to brokers about plans to restore debit cards, demonstrating knowing falsity of representations about fund accessibility.

**iii. False Statements Regarding Claim Payment Status (by Geoff Kirk)**

80. Between October 2023 and August 2024, Geoff Kirk, acting in his capacity as manager with supervisory authority over customer service representatives, repeatedly instructed employees to make false statements to customers regarding the status of their medical claims.

81. Specifically, when customers called HMA's customer service line to inquire about the status of submitted claims, Kirk instructed customer service representatives (including Hollie Shelton) to tell customers that claims checks had been sent, when in fact the checks remained physically present in stacks on Kirk's desk at HMA's Houston office.

82. As Shelton explained: "There would be stacks of checks. He [Geoff Kirk] would check, and he'd be like, it's right here. Tell him that it tell him it's went out yet. Tell him it's already went out."

83. These false statements were made to specific customers on specific dates when they called HMA's customer service line. Upon information and belief, Kirk's instructions resulted in hundreds of false statements to customers between October 2023 and August 2024.

84. Kirk knew these statements were false at the time he instructed employees to make them, as evidenced by his physical verification that the checks had not been sent before instructing employees to tell customers otherwise.

85. These false statements were material because customers relied on them in deciding whether to: (a) continue paying monthly contributions to HMA; (b) pursue alternative methods of paying their medical bills; and (c) file complaints against HMA.

**iv. False Representations in "Important Notice" (by Regina Gorog)**

86. Each Primary Holder Contract executed between 2016 and 2024 included an "Important Notice" at the beginning of the contract, signed by Regina Gorog as HMA's President and dated as of the contract execution date.

87. For Plaintiff Mainini's contract executed in 2022, Regina Gorog signed an "Important Notice" stating: "Please remember it is in your best interest to make contributions without using your account for as long as possible to allow the excess benefit to work for you and your account will build as projected in the HMA® Account Value Tables at the end of this Agreement."

88. This statement was false when made because: (a) HMA had no intention of actually funding matching contributions as shown in the Account Value Tables; (b) customer accounts would not "build as projected" because the matching was "phantom" (per Phil Burghardt); and (c) Regina Gorog knew from her control over HMA's finances that HMA was not setting aside funds to honor the projected account values.

89. Regina Gorog intended that customers, including Plaintiff Mainini, rely on this signed statement in deciding to enroll in HMA and make monthly contributions for the full 35-month period without using their accounts.

**E. THE PONZI SCHEME STRUCTURE AND DOCUMENTED INSOLVENCY**

90. As Elliott Gorog explicitly admitted on December 9, 2023, HMA operated as a "Ponzi scheme," using new customer contributions to pay earlier customers' claims rather than maintaining adequately funded, segregated accounts.

91. The hallmarks of a Ponzi scheme are all present: (a) promises of extraordinary returns (doubling customers' money); (b) use of new investor funds to pay earlier investors; (c) lack of legitimate underlying business operations to generate the promised returns; (d) commingling of funds; and (e) inevitable collapse when new money stops flowing in.

92. Under Fifth Circuit precedent, a Ponzi scheme is "as a matter of law, insolvent from its inception." *Janvey v. Democratic Senatorial Campaign Committee, Inc*., 714 F.3d 667, 670 (5th Cir. 2013).

93. The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.

94. Proving that HMA operated a Ponzi scheme establishes fraudulent intent as a matter of law. *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011).

95. The financial records obtained by the United States in its civil enforcement action provide conclusive documentary evidence of HMA's insolvency:

October 1, 2023:

- HMA's actual cash: $130,609.20 (PlainsCapital Bank Account No. ending in 8956)
- HMA's reported member obligations: $33,034,560.42
- Shortfall: $32,903,951.22 (99.6% of obligations)
- Active members: 8,537

November 22, 2023:

- HMA's actual cash: $990,720.83
- HMA's reported member obligations: $35,820,212.12
- Shortfall: $34,829,491.29 (97.2% of obligations)
- Active members: 8,827

December 1, 2023:

- HMA's actual cash: $1,104,326.34
- HMA's reported member obligations: $36,278,020.49
- Shortfall: $35,173,694.15 (97.0% of obligations)
- Active members: 9,028

January 1, 2024:

- HMA's actual cash: $1,183,794.85

- HMA's reported member obligations: $37,824,178.67

- Shortfall: $36,640,383.82 (96.9% of obligations)

- Active members: 9,155

February 1, 2024:

- HMA's actual cash: $1,401,769.18

- HMA's reported member obligations: $38,882,625.83

- Shortfall: $37,480,856.65 (96.4% of obligations)

- Active members: 9,390

96. These financial records establish that HMA could not possibly have honored its contractual obligations to customers and was deeply insolvent throughout the entire period from October 2023 through February 2024 and beyond.

97. Even as HMA's reported obligations to customers increased by approximately $5.8 million between October 1, 2023 and February 1, 2024, HMA's actual cash holdings increased by only approximately $1.27 million, demonstrating that HMA was using new contributions for purposes other than funding customer accounts.

**F. SYSTEMATIC FRAUDULENT TRANSFERS**

**i. Daily Transfers Documented by Hollie Shelton**

98. From approximately October 2023 through August 2024, while HMA was deeply insolvent, HMA made systematic daily transfers of customer funds from its operating accounts to other accounts controlled by or for the benefit of insiders.

99. Former employee Hollie Shelton observed and documented these transfers in the course of her employment at HMA's Houston office, explained in August 2025:

> "I would see it like every single day, you know, it'd be like $50,000 from a payout for health matching account, services to this bank account. You know, $27,000.40 $46,000 like these are daily transactions."

100. Shelton further explained that she took screenshots of these transfers when she observed them, stating: "I did forget to mention yesterday that I do, well, I did. I have probably five or six screenshots of when they do move the money."

101. These daily transfers were processed from HMA's PlainsCapital Bank accounts through Stripe payment processing accounts to other PlainsCapital Bank accounts.

102. Shelton explained: "the money that they move it to, like, when they're where they're moving it, they're moving it, I don't know, I don't know if it's the same account, but they move it to, like, a plains capital bank, through stripe, like every morning."

103. The pattern of daily transfers ranging from $27,000 to $50,000 indicates systematic, intentional diversion of customer funds rather than ordinary business operations.

104. Calculating conservatively at an average of $35,000 per day over a 300-day period (October 2023 through August 2024), these systematic daily transfers totaled approximately $10.5 million in customer funds transferred to accounts controlled by or for the benefit of insiders.

**ii. Transfers for Personal Benefit of Regina Gorog and Elliott Gorog**

105. Financial records reviewed by the United States in its civil enforcement action reveal that Regina Gorog and Elliott Gorog used substantial HMA funds for personal expenses that do not appear to have any legitimate business purpose.

106. These personal expenses included: a. Leisure travel; b. Food and entertainment; c. Rent on a beachfront condominium that Regina and Elliott maintained for substantial personal use; d. Elliott Gorog's acknowledged use of funds for cocaine and other personal luxuries.

107. Upon information and belief, based on the United States' investigation and financial records, these personal use transfers totaled hundreds of thousands of dollars between 2023 and 2024.

108. These transfers were made from HMA's PlainsCapital Bank accounts while HMA was deeply insolvent and unable to pay legitimate customer claims, as documented in the financial records showing 96-99% shortfalls.

109. These transfers for personal use were made without reasonably equivalent value being given to HMA in exchange.

**iii. Transfers to Trust Defendants and Related Entities**

110. Upon information and belief, between 2023 and 2024, while HMA was insolvent, HMA made substantial transfers to:

a) The Regina Kathryn Gorog Trust and/or its beneficiaries;

b) The Elliott Clifford Gorog Trust and/or its beneficiaries;

c) The Garland Levit 2011 Irrevocable Trust and/or its beneficiaries;

d) The Donald N. Levit 2010 Descendants Trust and/or its beneficiaries;

e) Investments of Mother and Son, LLC;

f) Think Wellness Now, Inc.;

g) Health Maintenance Plus Agency, Inc.,

h) Pet Health Matching Account Services, Inc..,

i) Agents Commission Advance Association, LLC

j) Garland Levit individually;

k) Donald Levit individually.

111. Upon information and belief, these transfers were characterized as "distributions," "loans," "management fees," "consulting fees," or similar descriptions designed to disguise their true nature as fraudulent diversions of customer funds.

112. These transfers were made while HMA was deeply insolvent, as documented by the financial records showing HMA held less than 4% of its reported obligations throughout the period from October 2023 through February 2024.

113. These transfers were made without reasonably equivalent value being given to HMA in exchange.

114. These transfers depleted HMA's assets available to pay customer claims and were made with actual intent to hinder, delay, or defraud HMA's creditors (the customers).

115. The systematic nature of these transfers—occurring daily and totaling millions of dollars while HMA was insolvent—demonstrates a coordinated scheme to strip HMA's assets for the benefit of insiders.

**G. DAMAGES TO CLASS MEMBERS**

116. As a direct result of Defendants' fraudulent conduct, Plaintiff and Class members have suffered substantial damages including:

a) Loss of all contributions made to their HMA accounts;

b) Loss of promised matching funds that were never actually funded;

c) Monthly maintenance fees paid for services that were never provided as promised;

d) Out-of-pocket medical expenses incurred when HMA failed to pay legitimate claims;

e) Interest and financing costs incurred to pay medical expenses that HMA should have paid;

f) Damage to credit ratings resulting from unpaid medical bills;

g) Emotional distress and anxiety from inability to pay for needed medical care;

h) Time and expense pursuing HMA for payment of legitimate claims.

117. The total damages to the Class exceed tens of millions of dollars.

118. Customers who terminated their contracts with HMA forfeited all funds in their accounts under HMA's contractual terms, which Elliott Gorog described as making HMA the "stickiest product known to man."

119. Customers who remain with HMA continue to pay monthly maintenance fees while receiving materially different and inferior services than promised, with no realistic prospect of accessing their purported account balances.

**V. CLASS ACTION ALLEGATIONS**

120. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following proposed class:

> All persons and entities in the United States who entered into Primary Holder Contracts or Dependent/Family Member Contracts with HMA at any time from 2015 to the present.

121. Excluded from the Class are: (a) Defendants and their officers, directors, agents, employees, and immediate family members; (b) any entity in which any Defendant has a controlling interest; (c) the legal representatives, heirs, successors, and assigns of any excluded person or entity; (d) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

122. NUMEROSITY: The Class is so numerous that joinder of all members is impracticable. There are more than 9,000 customers nationwide who have enrolled in HMA's program since 2015. The exact number and identities of Class members are readily ascertainable from HMA's business records.

123. COMMONALITY: There are numerous questions of law and fact common to the Class, including: Whether HMA breached its contracts; Whether Defendants made false representations regarding matching funds and fund accessibility; Whether Defendants operated HMA as a Ponzi scheme; Whether HMA was insolvent; Whether Defendants made fraudulent transfers; Whether Defendants violated the DTPA; Whether the trust defendants are alter egos of their beneficial owners; Whether the corporate veil should be pierced; Whether Class members are entitled to rescission; The proper measure of damages.

124. TYPICALITY: Plaintiff's claims are typical of the claims of the Class. All Class members entered into contracts with HMA based on the same standardized representations and contract terms, made monthly contributions in reliance on promises of matching funds and accessible accounts, and have been harmed by HMA's uniform breach and fraudulent conduct.

125. ADEQUACY: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel experienced in class action litigation and consumer fraud cases.

126. PREDOMINANCE AND SUPERIORITY: The questions of law and fact common to Class members predominate over questions affecting only individual members. All Class members are subject to the same standardized contracts, marketing materials, and business practices. A class action is superior to other methods for adjudication because individual litigation would be economically impractical and a class action will provide judicial economy.

## VI.
## CAUSES OF ACTION

**COUNT 1: BREACH OF CONTRACT** (On Behalf of Plaintiff and the Class v. HMA)

127. Paragraphs 1-126 are incorporated by reference.

128. Plaintiff and other Class Members entered into written contracts with HMA consisting of Primary Holder Contracts signed by Regina Gorog as President, incorporating HMA Account Value Tables and Terms and Conditions.

129. These contracts constituted binding agreements whereby Class Members agreed to make monthly contributions and pay monthly maintenance fees in exchange for HMA's promises to: (a) match customer contributions dollar-for-dollar up to specified caps; (b) maintain customer funds in accessible accounts; (c) pay legitimate medical expenses from customer accounts; (d) provide debit card or other ready access to funds; (e) operate as a legitimate health savings program.

130. Plaintiff and Class Members fully performed their obligations.

131. HMA breached these contracts uniformly by: (a) failing to match customer contributions; (b) failing to maintain properly segregated accounts; (c) canceling debit cards and implementing a system designed to deny claims; (d) systematically denying, delaying, and reducing legitimate claims; (e) operating as a Ponzi scheme; (f) diverting customer funds for improper purposes; (g) maintaining insufficient funds to honor obligations.

132. As a direct result, Plaintiff and the Class have been damaged and are entitled to compensatory damages, rescission, restitution, and all other relief.

**COUNT 2: TEXAS DECEPTIVE TRADE PRACTICES ACT (**(On Behalf of Plaintiff and the Class v. HMA, Elliott Gorog, Regina Gorog, and Geoff Kirk)

133. Paragraphs 1-126 are incorporated by reference.

134. Robert Mainini is a "consumer" within the meaning of the DTPA, Tex. Bus. & Com. Code § 17.45(4), because he sought to acquire and did acquire services from HMA by purchase for personal, family, and household use.

135. Specifically, Mr. Mainini purchased the following "services" as defined in Tex. Bus. & Com. Code § 17.45(2):

a) Monthly administration and maintenance of his contribution account, as specified in Section 3 of his Primary Holder Contract, which stated that "HMA SERVICES will maintain the Primary's HMA Contribution, less applicable maintenance and administrative fees, in its Contribution account and records will be maintained for the Primary to show his/her account balance";

b) Application of a "multiplier" to his contribution account "as illustrated in Exhibit 1" (the HMA Account Value Tables), as specified in Section 3 of his contract;

c) Claim determination and payment services, as specified in Section 3, which stated that "HMA SERVICES will determine if it is an Eligible Expense and debit the claim amount, up to the HMA Account Balance, from the Primary's Contribution Account";

d) Website access services for viewing account balances, as specified in Section 3;

e) Preparation of Explanations of Benefits (EOBs);

f) Handling of inquiries via phone, written correspondence, or in-person related to membership, benefits, and claim payment or denial;

g) Assistance with enrollment, education about the HMA program, and claim submission;

h) Access to customer service telephone support;

i) Processing and payment of medical claims for qualified medical expenses as defined in 26 U.S.C. § 213(d).

136. These services were purchased by Mr. Mainini for the personal, family, and household purpose of paying for his own and his family's medical expenses, not for resale or use in the production or manufacture of goods.

137. Mr. Mainini received marketing materials describing these services, signed a contract specifying these services, paid monthly fees ($51.00 per month) designated as "maintenance fees" for these services, and paid additional monthly contributions ($200 per month) that HMA promised to "match" through its service of applying a "multiplier" to his account.

138. The other members of the Class are also consumers within the meaning of the DTPA who acquired the same services from HMA for personal, family, or household use.

**SPECIFIC DECEPTIVE ACTS BY ELLIOTT GOROG**

**Deceptive Act #1: False Matching Fund Representations (2022)**

139. In 2022, Elliott Gorog, acting in his capacity as HMA's marketing director and authorized agent, made specific representations to insurance brokers nationwide (including the broker who recruited Mr. Mainini) that HMA would "match" customer contributions dollar-for-dollar up to specified caps.

140. These representations were made through: (a) written marketing materials distributed to insurance brokers bearing HMA's corporate logo and Elliott Gorog's contact information as the marketing director; (b) the HMA website at healthmatchingaccounts.com which was under Elliott Gorog's control as marketing director; and (c) verbal presentations to brokers and agents that Elliott Gorog personally conducted or directed as part of his marketing responsibilities.

141. Mr. Mainini received these representations indirectly through his insurance broker in 2022, before enrolling in the HMA program.

142. These representations were false when made because no actual matching funds were ever set aside or added to customer accounts. As ClaimChoice CEO Phil Burghardt confirmed on October 7, 2024: "All matching was phantom and money never actually was added to client accounts as promised."

143. Elliott Gorog knew these representations were false or made them with reckless disregard for their truth when he made them, as evidenced by his December 9, 2023 text message admission that HMA was operating a "Ponzi scheme."

144. Elliott Gorog intended that prospective customers, including Mr. Mainini, rely on these representations in deciding to enroll in HMA accounts and make monthly contributions.

145. Mr. Mainini actually relied on these representations, as communicated to him by his broker, in deciding to enroll in HMA's program in 2022.

146. This conduct violated Tex. Bus. & Com. Code § 17.46(b)(5) (representing that goods or services have characteristics or benefits that they do not have).

147. This conduct also violated Tex. Bus. & Com. Code § 17.46(b)(7) (representing that goods or services are of a particular standard, quality, or grade when they are of another).

148. Deceptive Act #2: False Debit Card Accessibility Representations (2022-2023)

149. 144. Between 2022 and October 2023, Elliott Gorog, acting in his capacity as HMA's marketing director, represented through marketing materials and the HMA website that customers would have easy access to their funds through debit cards for medical expenses.

150. 145. Mr. Mainini received these representations when he enrolled in 2022 and initially received a functioning debit card, which concretely represented that his funds were accessible.

151. On October 10, 2023, HMA sent an email from customercare@ healthmatchingaccounts.com (controlled by Elliott Gorog as marketing director) to all members, including Mr. Mainini, representing that the elimination of debit cards was due to "fraud and abuse."

152. This October 10, 2023 representation was false because the actual reason for eliminating debit cards was to prevent customers from accessing their funds and to give HMA control to deny claims, as evidenced by HMA's documented insolvency (holding only $130,609.20 against obligations of $33,034,560.42 on October 1, 2023).

153. Elliott Gorog knew this representation was false when made, as evidenced by his January 12, 2024 text message admitting he was lying to brokers about plans to restore debit cards.

154. Elliott Gorog intended that customers, including Mr. Mainini, rely on this representation in continuing to make monthly contributions rather than terminating their accounts.

155. Mr. Mainini actually received and reviewed the October 10, 2023 email and relied on the representation by continuing to make monthly contributions.

156. This conduct violated Tex. Bus. & Com. Code § 17.46(b)(9) (advertising goods or services with intent not to provide them as advertised).

**Deceptive Act #3: False Representation of Service Performance Intent (2022)**

157. In 2022, when Mr. Mainini enrolled, Elliott Gorog made representations through HMA's contract documents (which he controlled as marketing director) that HMA services would be performed as specified, including that medical claims would be paid promptly and in full from customer accounts.

158. This representation was false because Elliott Gorog had designed or was designing the "pocket the savings" scheme, as evidenced by his later text message: "we're going to charge members account balances the unadjudicated amount and pocket the savings."

159. Elliott Gorog knew or recklessly disregarded that this representation was false when it was made to Mr. Mainini in 2022, as evidenced by the pre-existing fraudulent business model and his later admissions.

160. Elliott Gorog intended that Mr. Mainini rely on these representations in deciding to enroll and make monthly contributions.

161. Mr. Mainini actually relied on these representations when he signed his contract in 2022 and began making monthly contributions.

162. This conduct violated Tex. Bus. & Com. Code § 17.46(b)(12) (representing that an agreement confers or involves rights, remedies, or obligations that it does not have or involve).

## SPECIFIC DECEPTIVE ACTS BY REGINA GOROG

### Deceptive Act #4: False Matching Fund Promises in Primary Holder Contract (2022)

163. In 2022, when Mr. Mainini enrolled, Regina Gorog signed Mr. Mainini's Primary Holder Contract as HMA's President.

164. At the beginning of this contract, Regina Gorog signed an "Important Notice" dated as of the contract execution date in 2022, which stated: "Please remember it is in your best interest to make contributions without using your account for as long as possible to allow the excess benefit to work for you and your account will build as projected in the HMA® Account Value Tables at the end of this Agreement."

165. This representation was false when made because Regina Gorog never intended for customer accounts to "build as projected" in the Account Value Tables, as evidenced by: (a) the documented insolvency showing HMA held less than 1% of reported obligations; (b)

Phil Burghardt's confirmation that matching was "phantom"; and (c) Regina's control over HMA's finances revealing she knew no matching was occurring.

166. Regina Gorog knew this representation was false when she signed it in 2022, or acted with reckless disregard for its truth, as evidenced by her position as President and sole signatory on HMA's bank accounts giving her knowledge of HMA's true financial condition.

167. Regina Gorog intended that Mr. Mainini rely on this signed statement in deciding to enroll and make monthly contributions for the full 35-month period without using his account.

168. Mr. Mainini actually received and reviewed this signed "Important Notice" as part of his contract in 2022 and relied on it in deciding to enroll and make contributions.

169. This conduct violated Tex. Bus. & Com. Code § 17.46(b)(5) and § 17.46(b)(12).

**SPECIFIC DECEPTIVE ACTS BY GEOFF KIRK**

**Deceptive Act #5: False Claim Payment Status Representations (2023-2024)**

170. Between October 2023 and August 2024, Geoff Kirk, acting in his capacity as a manager at HMA with supervisory responsibility over customer service representatives, engaged in a systematic practice of instructing employees to make false representations to consumers regarding the status of their medical claims.

171. Specifically, when customers (including upon information and belief, Mr. Mainini and other Class members) called HMA's customer service line to inquire about the status of submitted claims, Kirk instructed customer service representatives to tell consumers that claims checks had been sent, when in fact the checks remained unsent at HMA's Houston office.

172. As Hollie Shelton stated in August 2024: "There would be stacks of checks. He [Geoff Kirk] would check, and he'd be like, it's right here. Tell him that it tell him it's went out yet. Tell him it's already went out."

173. These false representations were made by HMA customer service representatives following Kirk's direct instructions, on specific dates when specific customers called, between October 2023 and August 2024.

174. Kirk knew these representations were false at the time he instructed employees to make them, as evidenced by his physical verification that checks had not been sent before instructing employees to tell customers otherwise.

175. Kirk intended that customers rely on these false representations in deciding whether to continue making monthly contributions to HMA and in deciding whether to pursue alternative methods of paying their medical bills.

176. Mr. Mainini and other Class members actually received these false representations when they called HMA's customer service line to inquire about claim status, and relied on these representations by continuing to make monthly contributions and believing their claims were being processed.

177. This conduct violated Tex. Bus. & Com. Code § 17.46(b)(12) and § 17.46(b)(24) (failing to disclose information known at the time of the transaction).

**UNCONSCIONABLE CONDUCT**

178. Defendants engaged in unconscionable action or course of action within the meaning of Tex. Bus. & Com. Code § 17.45(5) and § 17.50(a)(3) by: (a) taking advantage of customers' lack of knowledge about HMA's true financial condition; (b) creating a contractual structure that trapped customers by forcing them to forfeit all funds if they terminated; (c) systematically transferring customer funds for personal use while maintaining a facade of

solvency; (d) operating a Ponzi scheme while representing legitimate business operations; (e) maintaining grossly inadequate reserves while promising matching funds.

**PRODUCING CAUSE AND DAMAGES**

179. Defendants' deceptive acts and unconscionable conduct were each a producing cause of actual damages to Robert Mainini and other Class members.

180. Specifically, Mr. Mainini paid $251 per month ($51 maintenance fee + $200 contribution) in direct payments to HMA.

181. Mr. Mainini was promised matching funds that would increase his account balance to $10,000 based on the HMA Account Value Tables, but received no actual matching funds.

182. Mr. Mainini submitted claims for medical expenses that were not paid or were substantially delayed by HMA.

183. As a direct result of Defendants' DTPA violations, Class members have suffered economic damages including: (a) loss of all contributions to HMA accounts; (b) loss of promised matching funds; (c) monthly maintenance fees paid for services not provided as promised; (d) out-of-pocket medical expenses.

**KNOWING AND INTENTIONAL VIOLATIONS**

184. Defendants' violations of the DTPA were committed knowingly and intentionally.

185. Elliott Gorog admitted in his December 9, 2023 text message that HMA was a "Ponzi scheme" and on February 16, 2024 referred to HMA as a "scam," demonstrating knowing violation.

186. Regina Gorog's control over HMA's finances and position as sole signatory on HMA's bank accounts gave her actual knowledge that matching funds were not being funded and that HMA was insolvent, demonstrating knowing violation.

187. Geoff Kirk's physical verification that checks had not been sent before instructing employees to tell customers otherwise demonstrates knowing violation.

188. Because Defendants' violations were knowing and intentional, Plaintiff is entitled to recover three times economic damages under Tex. Bus. & Com. Code § 17.50(b)(1), plus court costs and reasonable attorney fees.

189. Plaintiff and the Class are entitled to: (a) rescission of transactions with HMA and restoration of consideration paid, under Tex. Bus. & Com. Code § 17.50(b)(1); (b) injunction restraining Defendants from continuing the acts and practices alleged herein, under § 17.50(b)(2); (c) treble damages under § 17.50(b)(1); (d) reasonable attorney's fees under § 17.50(d); (e) court costs under § 17.50(d).

**COUNT 3: FRAUDULENT TRANSFER – ACTUAL FRAUD UNDER TUFTA § 24.005(a)(1) (**On Behalf of Plaintiff and the Class v. Regina Gorog, Elliott Gorog, Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust, Garland Levit individually, Donald Levit individually, Investments of Mother and Son LLC, Think Wellness Now Inc., Geoff Kirk, Health Maintenance Plus Agency, Inc., Pet Health Matching Account Services, Inc.., Agents Commission Advance Association, LLC, and John Doe Defendants 1-10)

190. Paragraphs 1-190 are incorporated by reference as though fully stated herein.

191. This claim is brought pursuant to the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code §§ 24.001-24.013.

**PLAINTIFF'S CREDITOR STATUS**

192. Plaintiff and all Class members are "creditors" of HMA within the meaning of TUFTA § 24.002(4) because they have "claims" against HMA.

193. Specifically, Plaintiff and Class members have unsecured claims against HMA arising from: (a) HMA's breach of contract; (b) HMA's violations of the Texas DTPA; (c) HMA's failure to honor its contractual obligations to maintain and pay customer account balances.

194. Under TUFTA § 24.002(3), a "claim" includes "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

195. Plaintiff's claims against HMA arose from contracts entered into and contributions made in 2022 and continuing through the present—both before, during, and after the transfers alleged herein.

196. Plaintiff's claims need not be reduced to judgment to pursue fraudulent transfer claims under TUFTA.

**HMA OPERATED AS AN ADMITTED PONZI SCHEME**

197. As alleged above and admitted by Elliott Gorog in his December 9, 2023 text message, HMA operated as a Ponzi scheme.

198. Courts in the Fifth Circuit recognize that proving a debtor operated a Ponzi scheme establishes fraudulent intent behind transfers as a matter of law. *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011).

199. "The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Quilling v. Schonsky*, No. 3:05-cv-02122 (N.D. Tex. Dec. 19, 2006).

200. "A Ponzi scheme is, 'as a matter of law, insolvent from its inception.'" *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 714 F.3d 667, 670 (5th Cir. 2013).

201. Therefore, HMA's operation as an admitted Ponzi scheme establishes both: (a) HMA's actual intent to hinder, delay, or defraud creditors (satisfying TUFTA § 24.005(a)(1)); and (b) HMA's insolvency from inception.

## SPECIFIC FRAUDULENT TRANSFERS

**Category 1: Systematic Daily Transfers Through Stripe (October 2023 – August 2024)**

202. From approximately October 1, 2023 through August 31, 2024, HMA made systematic daily transfers of customer funds from HMA's operating account at PlainsCapital Bank (Account No. ending in 8956) through Stripe payment processing accounts (Account IDs: acct_****vejH, acct_****rp2t, acct_****UYzw) to other accounts at PlainsCapital Bank controlled by or for the benefit of the individual defendants and trust defendants.

203. Transferor: Health Matching Account Services, Inc., acting through Regina Gorog as sole authorized signatory on the source account (PlainsCapital Bank Account No. ending in 8956).

204. Transferees: Upon information and belief, the destination accounts were held in the names of or for the benefit of one or more of the following: Regina Gorog individually; Elliott Gorog individually; The Regina Kathryn Gorog Trust; The Elliott Clifford Gorog Trust; The Garland Levit 2011 Irrevocable Trust; The Donald N. Levit 2010 Descendants Trust; Garland Levit individually; Donald Levit individually; Investments of Mother and Son, LLC; Think Wellness Now, Inc.; and/or accounts controlled by John Doe Defendants (including the financial institutions that processed these transfers).

205. Source of Funds: Customer contributions deposited into HMA's PlainsCapital Bank Account No. ending in 8956, which funds were subject to customer claims as creditors of HMA arising from the Primary Holder Contracts.

206. Amounts and Dates: As documented by Hollie Shelton's testimony, these transfers occurred daily ("every single day") and ranged in amount from approximately $27,000 to $50,000 per transfer. Based on a conservative estimate of $35,000 per day over 335

days (October 1, 2023 through August 31, 2024), total transfers in this category exceed $11,725,000.

207. Financial Condition on Transfer Dates: At all times during the period from October 1, 2023 through August 31, 2024, HMA was deeply insolvent:

- October 1, 2023: HMA held $130,609.20 against obligations of $33,034,560.42
- November 22, 2023: HMA held $990,720.83 against obligations of $35,820,212.12
- December 1, 2023: HMA held $1,104,326.34 against obligations of $36,278,020.49
- January 1, 2024: HMA held $1,183,794.85 against obligations of $37,824,178.67
- February 1, 2024: HMA held $1,401,769.18 against obligations of $38,882,625.83

Throughout this period, HMA held less than 4% of its reported obligations to customers, establishing insolvency at the time of each transfer.

208. Badges of Fraud Supporting Actual Intent: The following badges of fraud, tied to specific facts, establish HMA's actual intent to hinder, delay, or defraud creditors:

a) BADGE: Transfers to insiders. FACTS: The transfers were made from HMA's customer account to accounts controlled by or for the benefit of HMA's owners (the trust defendants and their beneficiaries) and officers (Regina Gorog, Elliott Gorog, Garland Levitt).

b) BADGE: Debtor retained possession or control after transfer. FACTS: Regina Gorog, as sole signatory on the source account and as President of HMA, controlled both the source and (upon information and belief) destination accounts. The trust defendants, as 100% owners of HMA, retained ultimate control over all HMA assets.

c) BADGE: Transfer was concealed. FACTS: These transfers were not disclosed to customers, who believed their contributions were being maintained in their individual accounts. Hollie Shelton observed the transfers only because of her access to HMA's internal financial systems; customers had no knowledge of these daily diversions.

d) BADGE: Debtor was insolvent or became insolvent shortly after transfer. FACTS: As documented above, HMA was deeply insolvent (holding less than 4% of obligations) on every date these transfers were made.

e) BADGE: Transfer occurred shortly after substantial debt was incurred. FACTS: Each time a new customer enrolled and made contributions, HMA incurred a substantial new debt (the obligation to match and maintain accessible funds). The transfers occurred contemporaneously with these continuing debt incurrences.

f) BADGE: Transfer was of substantially all debtor's liquid assets. FACTS: The daily transfers of $27,000-$50,000 represented substantial portions (often 20- 40%) of HMA's total liquid assets on any given day, as shown by the total cash balances of $130,000-$1,400,000 during this period.

g) BADGE: Debtor removed or concealed assets. FACTS: By transferring funds daily through Stripe to other accounts, HMA systematically removed liquid assets that should have been available to pay customer claims.

h) BADGE: Value of consideration received was not reasonably equivalent. FACTS: HMA received no consideration whatsoever for these transfers to insiders. The transfers depleted HMA's assets available to satisfy customer claims.

i) BADGE: Debtor was engaged in business for which remaining assets were unreasonably small. FACTS: After each daily transfer, HMA's remaining assets (less than 4% of obligations) were grossly inadequate for HMA's business of maintaining customer accounts and paying medical claims.

**Category 2: Specific Transfers for Personal Benefit of Regina Gorog and Elliott Gorog**

209. Upon information and belief, between October 1, 2023 and October 15, 2025, while HMA was deeply insolvent as documented above, Regina Gorog and Elliott Gorog

caused HMA to make transfers from HMA's PlainsCapital Bank accounts for their personal benefit, including but not limited to:

a) Transfers for leisure travel expenses exceeding $500,000(dates and amounts to be specified through discovery);

b) Transfers for food and entertainment expenses exceeding $100,000 (dates and amounts to be specified through discovery);

c) Transfers for rent on a beachfront condominium maintained by Regina and Elliott for substantial personal use, totaling approximately $500,000 (specific dates and amounts to be specified through discovery);

d) Other transfers for personal expenses including Elliott's acknowledged purchases of cocaine and luxury items (dates and amounts to be specified through discovery).

210. Transferor: HMA, acting through Regina Gorog as authorized signatory.

211. Transferees: Regina Gorog individually and Elliott Gorog individually, and/ or entities controlled by them for their benefit.

212. Source of Funds: Customer contributions in HMA's PlainsCapital Bank accounts, which funds were subject to customer claims arising from Primary Holder Contracts.

213. Class Members' Claims: The claims of Plaintiff and all Class members who had enrolled and made contributions to HMA as of each transfer date, including specifically Mr. Mainini who enrolled in 2022 and had an outstanding claim for matching funds and account access as of each transfer date.

214. Lack of Reasonably Equivalent Value: HMA received no value whatsoever in exchange for these personal use transfers. The transfers depleted HMA's assets available to satisfy customer claims and provided no business benefit to HMA.

215. Financial Condition: As documented above, HMA held less than 4% of its obligations throughout this period, establishing insolvency at the time of each transfer.

216. Badges of Fraud: In addition to the badges alleged for Category 1, these transfers exhibit the additional badge that the transfers were for the personal benefit of insiders (Regina and Elliott Gorog) who controlled HMA and had knowledge of its insolvency.

**Category 3: Transfers to Trust Defendants and Related Entities**

217. Upon information and belief, between January 1, 2023 and October 15, 2025, while HMA was operating as a Ponzi scheme and was insolvent, HMA made substantial transfers to or for the benefit of:

a) The Regina Kathryn Gorog Trust and/or its beneficiaries;

b) The Elliott Clifford Gorog Trust and/or its beneficiaries;

c) The Garland Levit 2011 Irrevocable Trust and/or its beneficiaries;

d) The Donald N. Levit 2010 Descendants Trust and/or its beneficiaries;

e) Investments of Mother and Son, LLC;

f) Think Wellness Now, Inc.;

g) Health Maintenance Plus Agency, Inc.,

h) Pet Health Matching Account Services, Inc..,

i) Agents Commission Advance Association, LLC

j) Garland Levit individually;

k) Donald Levit individually.

218. Upon information and belief, these transfers were characterized as "distributions," "dividends," "loans," "management fees," "consulting fees," or similar descriptions, and were made from HMA's PlainsCapital Bank accounts to accounts controlled by or for the benefit of the transferee defendants.

219. Transferor: HMA, acting through Regina Gorog and/or Elliott Gorog as authorized signatories.

220. Source of Funds: Customer contributions deposited into HMA's accounts, which funds were subject to the claims of all customers who had enrolled and made contributions as of each transfer date.

221. Amounts: Upon information and belief, these transfers totaled millions of dollars. Specific amounts, dates, and destination account information will be determined through discovery, but the systematic daily transfers documented by Shelton (Category 1 above) represent the mechanism through which many of these transfers were accomplished.

222. Financial Condition: Throughout the period 2023-2024, HMA was deeply insolvent, as documented by the October 2023-February 2024 financial records showing HMA held less than 4% of its obligations.

223. Knowledge: The transferee defendants knew or should have known of HMA's insolvency and fraudulent operations at the time of these transfers because: (a) Regina Gorog and Elliott Gorog, as trustees of two of the trust defendants and as officers of HMA, had direct knowledge; (b) Garland Levit, as trustee of two of the trust defendants and as co-founder of HMA, had direct knowledge; (c) Elliott Gorog's December 9, 2023 admission that HMA was a "Ponzi scheme" demonstrates the trustees' knowledge; (d) the trust defendants, as 100% owners of HMA, had access to or should have requested financial information revealing HMA's insolvency.

224. Badges of Fraud: All badges alleged for Categories 1 and 2 apply to these transfers, plus the additional badge that the transferees are the beneficial owners of HMA (through the trust structure) who used the corporate form to perpetrate fraud while attempting to shield themselves from liability.

225. Lack of Reasonably Equivalent Value: These transfers to the beneficial owners provided no value to HMA because: (a) the trusts are the owners of HMA, so "distributions" deplete the corporate estate available to creditors without providing value; (b) upon information

and belief, any purported "services" for which "fees" were paid were not actually rendered or were grossly overcompensated; (c) the transfers depleted HMA's assets available to satisfy customer claims.

**PONZI SCHEME PRESUMPTION OF ACTUAL INTENT**

226. Because HMA operated as an admitted Ponzi scheme, all transfers made by HMA are presumed to have been made with actual intent to hinder, delay, or defraud creditors.

227. Elliott Gorog's December 9, 2023 admission that HMA was "my Ponzi scheme" establishes this as an admitted Ponzi scheme.

228. Under Fifth Circuit law applicable in this District, the Ponzi scheme presumption satisfies the actual intent requirement of TUFTA § 24.005(a)(1) as a matter of law.

**VOIDABILITY OF TRANSFERS**

229. Under TUFTA § 24.008(a)(1), the fraudulent transfers described above are voidable by Plaintiff as a creditor of HMA.

230. Under TUFTA § 24.008(a)(3)(A), Plaintiff is entitled to recover judgment for the value of the transferred assets or the amount necessary to satisfy Plaintiff's claims, whichever is less, against: (a) the first transferee of the asset (the individual, trust, or entity defendants who received the transfers); and (b) any subsequent transferee.

231. Under TUFTA § 24.010(a), Plaintiff is entitled to recover reasonable attorney's fees and costs in pursuing this fraudulent transfer action.

**RELIEF SOUGHT**

232. Plaintiff requests that this Court:

a. Declare that the transfers from HMA to the defendant transferees are void under TUFTA § 24.005(a)(1);

b. Enter judgment requiring the transferee defendants to return all transferred assets to HMA or to pay to Plaintiff the value of the transferred assets;

c. Enter judgment requiring the transferee defendants to disgorge all benefits received from the fraudulent transfers;

d. Impose a constructive trust on all assets transferred from HMA to the transferee defendants;

e. Order an accounting of all transfers from HMA to the transferee defendants;

f. Award Plaintiff reasonable attorney's fees and costs under TUFTA § 24.010(a);

g. Award such other relief as the Court deems just and proper.

**COUNT 4: FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD UNDER TUFTA §§ 24.005(a) (2) AND 24.006** (On Behalf of Plaintiff and the Class v. Regina Gorog, Elliott Gorog, Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust, Garland Levit individually, Donald Levit individually, Investments of Mother and Son LLC, Think Wellness Now Inc., Geoff Kirk, Health Maintenance Plus Agency, Inc., Pet Health Matching Account Services, Inc.., Agents Commission Advance Association, LLC, and John Doe Defendants 1-10)

233. Paragraphs 1-232 are incorporated by reference.

234. In the alternative to Count Three, this claim is brought pursuant to TUFTA §§ 24.005(a)(2) and 24.006 for constructive fraud.

235. HMA made all transfers described in Count Three without receiving reasonably equivalent value in exchange because: (a) personal use transfers to Regina and Elliott Gorog provided no value to HMA; (b) transfers to trust defendants (HMA's owners) depleted HMA's estate without providing value; (c) transfers to related entities provided no reasonably equivalent value.

236. At the time HMA made each transfer, HMA was: (a) insolvent (sum of debts greater than fair valuation of assets); (b) engaged in business for which remaining assets were unreasonably small; and/or (c) intending to incur debts beyond its ability to pay.

237. The documented financial condition (holding less than 4% of obligations) establishes insolvency and unreasonably small capital at the time of each transfer.

238. Under TUFTA §§ 24.005(a)(2) and 24.006, these transfers are voidable and Plaintiff is entitled to the same relief as described in Count Three.

**COUNT 5: VEIL PIERCING/ALTER EGO** (On Behalf of Plaintiff and the Class v. Regina Kathryn Gorog as Trustee of the Regina Kathryn Gorog Trust, Elliott Clifford Gorog as Trustee of the Elliott Clifford Gorog Trust, Garland Levit as Trustee of the Garland Levit 2011 Irrevocable Trust, Garland Levit as Trustee of the Donald N. Levit 2010 Descendants Trust)

239. Paragraphs 1-232 are incorporated by reference.

240. Under Texas Bus. Orgs. Code § 21.223(b), a beneficial owner of a corporation may be held personally liable for contractual obligations when: (a) the claimant proves actual fraud; and (b) the actual fraud was perpetrated primarily for the direct personal benefit of the beneficial owner.

241. The trust defendants are "beneficial owners" of HMA as disclosed in HMA's Rule 7.1 Certificate filed December 17, 2024.

242. Under Texas law, trusts fall within the scope of § 21.223 as beneficial owners, and the statute's protections evaporate once actual fraud for the owner's direct benefit is proven.

**ACTUAL FRAUD**

243. As alleged throughout this Complaint, Regina Gorog and Elliott Gorog committed actual fraud through making knowing false representations to induce customers to enroll and make contributions.

244. "Actual fraud" means "dishonesty of purpose or intent to deceive," which is established by: (a) HMA's operation as an admitted Ponzi scheme; (b) the systematic misrepresentation of customer account balances when HMA held less than 1% of reported

balances; (c) the implementation of the "pocket the savings" scheme; (d) the false promises of matching funds; (e) the concealment of HMA's insolvency.

**FRAUD FOR DIRECT PERSONAL BENEFIT OF BENEFICIAL OWNERS**

245. The actual fraud was perpetrated primarily for the direct personal benefit of the trust defendants and their trustees/beneficiaries because: (a) customer funds were systematically transferred for personal use of Regina and Elliott Gorog (trustees of two trusts); (b) the fraudulent enterprise enriched the beneficial owners at the expense of customers; (c) the trust defendants received distributions of fraudulently obtained customer funds; (d) the beneficial owners used their ownership and control of HMA to perpetrate fraud for their direct financial benefit.

**ALTER EGO LIABILITY**

246. There exists such unity of interest and ownership between HMA and the trust defendants that separate personalities no longer exist, evidenced by: (a) common control (same individuals serve as officers of HMA and trustees of trusts); (b) commingling of funds; (c) inadequate capitalization; (d) failure to observe formalities; (e) use of corporate form to perpetrate fraud; (f) treatment of corporate assets as personal assets; (g) systematic daily transfers from HMA to accounts controlled by beneficial owners.

247. Adherence to the fiction of separate personalities would promote injustice because: (a) customers contracted based on representations about financial soundness; (b) beneficial owners used corporate form to commit fraud while attempting to shield themselves from liability; (c) beneficial owners personally benefited from fraud; (d) customers have no adequate remedy because HMA is insolvent.

248. Plaintiff requests that the Court: (a) pierce the corporate veil and hold trust defendants personally and jointly liable for all obligations of HMA; (b) disregard the separate legal existence of HMA and the trusts; (c) enter judgment requiring trust defendants to pay all

damages; (d) impose constructive trust on all assets held by trust defendants derived from HMA.

**COUNT 6: VEIL PIERCING: OFFICER LIABILITY UNDER TEXAS BUS. ORGS. CODE § 21.223(b)** (On Behalf of Plaintiff and the Class v. Elliott Gorog, Regina Gorog, and Garland Levit)

249. Paragraphs 1-248 are incorporated by reference.

**LEGAL STANDARD FOR OFFICER LIABILITY**

250. Under Texas Bus. Orgs. Code § 21.223(b), a corporate officer or other affiliate may be held personally liable for a corporation's contractual obligations when the plaintiff proves: (1) actual fraud was committed; and (2) the fraud was perpetrated primarily for the direct personal benefit of the officer.)

251. This heightened standard for officer liability reflects Texas's strong policy protecting officers from personal liability for corporate debts, but provides no shelter when officers use the corporate form to commit fraud for their own direct financial gain.

**DEFENDANTS SUBJECT TO OFFICER LIABILITY**

252. **Elliott Gorog** is an officer of HMA and an authorized signatory on HMA's primary bank account (PlainsCapital Bank Account No. ending in 8956). Elliott Gorog serves as HMA's marketing director with responsibility for sales, marketing, and customer relations.

253. **Regina Gorog** is the President of HMA and the sole authorized signatory on HMA's primary bank account (PlainsCapital Bank Account No. ending in 8956). Regina Gorog exercises ultimate control over all financial decisions at HMA, including which customers receive payments and which do not.

254. **Garland Levit** is an officer of HMA who, along with Regina Gorog and Donald Levit, co-founded HMA in or around 2015. Garland Levit has direct involvement in HMA's operations and management and serves as trustee of two trusts that collectively own 50% of HMA.

## ELEMENT ONE: UNITY OF INTEREST AND CONTROL

255. There exists such unity of interest and ownership between HMA and the officer defendants that the separate personalities of the corporation and the officers no longer exist. This is demonstrated by the following specific facts:

### Total Control Over HMA's Finances

256. Regina Gorog and Elliott Gorog were the only signatories on HMA's main bank account (PlainsCapital Bank Account No. ending in 8956), giving them exclusive control over all customer funds and claim payments.

257. There is no separation between ownership and management. The trusts that own 100% of HMA are controlled by Regina Gorog, Elliott Gorog, and Garland Levit—the same individuals who serve as HMA's officers. All real decisions affecting HMA are made by these three individuals acting in their dual capacities as officers and beneficial owners.

258. Former employee Hollie Shelton confirmed Regina Gorog's absolute control, testifying that "when Regina came in, if Regina felt like it, then they would make a check run"—demonstrating that claim payments were made arbitrarily based on Regina's personal whim rather than contractual obligation or corporate policy.

### Systematic Commingling of Corporate and Personal Funds

259. The officer defendants systematically commingled HMA's funds with their personal finances through:

a) Daily cash sweeps**:** Hollie Shelton documented that "every single day" substantial customer funds ($27,000 to $50,000) were transferred from HMA's accounts through Stripe to other accounts controlled by insiders. These systematic daily transfers totaling approximately $10.5 million demonstrate complete disregard for corporate formalities and separation of corporate and personal assets.

b) Personal use of corporate funds: Elliott Gorog and Regina Gorog used HMA funds for personal cocaine purchases, food, entertainment, and rent on a beachfront condominium they maintained for substantial personal use—demonstrating the kind of commingling that Texas courts recognize as evidence of alter ego.

c) Trust distributions: Upon information and belief, the officer defendants caused HMA to make distributions to trusts they control as trustees and beneficiaries, treating HMA's assets as their personal property available for distribution at will.

**Massive Undercapitalization**

260. HMA was grossly undercapitalized relative to its business operations and contractual obligations:

261. On October 1, 2023, HMA held only $130,609.20 in cash against contractual obligations of $33,034,560.42—less than 0.4% of its obligations, representing a 99.6% shortfall.

262. Throughout the period from October 2023 through February 2024, HMA never held more than 4% of its reported obligations to customers, demonstrating systematic and intentional undercapitalization.

263. This extreme undercapitalization was not inadvertent but was the result of the officer defendants' systematic diversion of customer funds for their personal benefit through the daily transfers documented by Shelton.

**Failure to Observe Corporate Formalities**

264. The officer defendants failed to maintain proper separation between HMA and themselves:

265. Customer funds were not properly segregated into individual accounts but were maintained in "slush accounts" as described by Hollie Shelton, with no actual money associated with any specific customer account despite representations to the contrary.

266. Claims processing was not conducted according to contractual terms or established procedures, but rather according to Regina Gorog's personal whims and Elliott Gorog's explicit instructions to "stiff the hospital and wipe out the HMA account balances."

267. The officer defendants made business decisions based on personal financial needs rather than corporate obligations, as evidenced by Elliott's November 27, 2023 text: "People are starting [to] come at me with pitch forks wanting their bills paid lol"—treating customer demands for contractual performance as personal annoyances.

**Use of HMA to Perpetrate Fraud**

268. The officer defendants used the corporate form of HMA as a vehicle to perpetrate fraud while attempting to shield themselves from personal liability:

269. Elliott Gorog explicitly admitted that HMA was "my Ponzi scheme," demonstrating his treatment of the corporation as a personal instrumentality for fraud.

270. Regina Gorog signed contracts as President making promises she knew were false, using her corporate office as a means to commit fraud.

271. The officer defendants structured HMA's ownership through trusts in an apparent attempt to create additional layers of insulation from liability while maintaining complete operational control.

**ELEMENT TWO: ACTUAL FRAUD COMMITTED**

272. The officer defendants committed actual fraud within the meaning of Texas law. "Actual fraud" under Texas veil-piercing law means intentional deception—a conscious act of dishonesty designed to mislead. See *Endsley Electric*, 378 S.W.3d at 22.

**HMA Operated as an Admitted Ponzi Scheme**

273. Elliott Gorog explicitly admitted in his December 9, 2023 text message that HMA operated as "my Ponzi scheme," stating: "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don."

274. On January 29, 2024, Elliott Gorog again referenced HMA as a "Donzi scheme."

275. On February 16, 2024, Elliott Gorog referred to HMA as a "scam" in internal communications.

276. These admissions establish the fraudulent nature of HMA's operations as a matter of law. The operation of a Ponzi scheme constitutes actual fraud per se, as it inherently involves using new investor funds to pay earlier investors while misrepresenting the source of returns and the financial condition of the enterprise.

**Deliberate Misrepresentations in Customer Contracts**

277. Regina Gorog signed each customer's Primary Holder Contract as HMA's President, including the "Important Notice" stating: "Please remember it is in your best interest to make contributions without using your account for as long as possible to allow the excess benefit to work for you and your account will build as projected in the HMA® Account Value Tables."

278. This representation was false and Regina Gorog knew it was false when she signed it because:

a) As sole signatory on HMA's bank accounts, Regina had direct knowledge that HMA was not setting aside matching funds.

b) As President with ultimate authority over financial decisions, Regina knew HMA was deeply insolvent and could not honor the projected account values in the HMA Account Value Tables.

c) ClaimChoice CEO Phil Burghardt confirmed that "All matching was phantom and money never actually was added to client accounts as promised."

279. These were not innocent misrepresentations or negligent errors—they were knowing, intentional false statements designed to induce customers to enroll and make contributions.

**Systematic Deception of Customers Regarding Claim Status**

280. The officer defendants directed and participated in systematic deception of customers regarding the status of their medical claims:

281. Geoff Kirk, acting under the authority and direction of Regina Gorog and Elliott Gorog, instructed customer service representatives to tell customers that claims checks had been sent when the checks remained physically present and unsent in HMA's office.

282. This deception was carried out pursuant to a policy established by the officer defendants to conceal HMA's failure to pay claims and prevent customers from discovering the fraud.

283. Elliott Gorog personally directed the deceptive practices, instructing staff to "stiff the hospital and wipe out the HMA account balances."

**Intentional Elimination of Debit Cards to Block Access**

284. On October 10, 2023—precisely when HMA's insolvency reached crisis levels (holding only $130,609.20 against obligations of $33,034,560.42)—the officer defendants eliminated customers' debit card access.

285. The stated reason (preventing "fraud and abuse") was false. The actual reason was to prevent customers from accessing their funds and to give HMA complete control over which claims would be paid.

286. Elliott Gorog admitted on January 12, 2024 that he was lying to brokers about plans to restore debit cards, demonstrating knowing falsity of representations about fund accessibility.

**Implementation of the "Pocket the Savings" Scheme**

287. Elliott Gorog designed and implemented an explicit scheme to defraud healthcare providers and customers, stating: "we're going to charge members account balances the unadjudicated amount and pocket the savings."

288. This scheme involved:

a) Charging customers' accounts for the full billed amount from healthcare providers.

b) Negotiating lower amounts with providers or denying claims entirely.

c) "Pocketing" the difference as additional profit for insiders.

d) Elliott celebrated the success of this fraud, bragging: "Before phil my claims were 30k a day now they are 7k lol"—a 77% reduction in claims payments achieved through fraud.

**Daily Transfers While Knowing of Insolvency**

289. The officer defendants caused HMA to make systematic daily transfers of $27,000 to $50,000 from customer accounts to accounts they controlled, while knowing that:

a) HMA held less than 1% of its reported obligations to customers (October 1, 2023).

b) HMA was operating as a Ponzi scheme (Elliott's December 9, 2023 admission).

c) These transfers would render HMA unable to pay legitimate customer claims.

290. The combination of these knowing transfers while maintaining false representations to customers constitutes actual fraud—intentional acts designed to deceive customers while enriching the officer defendants.

**ELEMENT THREE: FRAUD PERPETRATED PRIMARILY FOR DIRECT PERSONAL BENEFIT**

291. The actual fraud described above was perpetrated primarily for the direct personal benefit of Elliott Gorog, Regina Gorog, and Garland Levit. Texas law requires proof

that the fraud directly enriched the officers personally, not merely that it benefited the corporation. See *Lone Star Air Sys., Ltd. v. Powers*, 401 S.W.3d 855, 866 (Tex. App. 2013).

**Elliott Gorog's Direct Personal Benefit**

292. Elliott Gorog personally received substantial direct financial benefits from the fraud:

a) **Personal luxury expenses:** Elliott Gorog used HMA funds for acknowledged personal purchases including cocaine, food, entertainment, and leisure travel.

b) **Beachfront condominium:** Elliott Gorog and Regina Gorog used HMA funds to pay rent on a beachfront condominium they maintained for substantial personal use.

c) **Daily cash sweeps:** Upon information and belief, Elliott Gorog personally received portions of the systematic daily transfers of $27,000 to $50,000 from HMA's accounts documented by Hollie Shelton, totaling approximately $10.5 million over the October 2023-August 2024 period.

d) **Trust distributions:** As a trustee and beneficiary of the Elliott Clifford Gorog Trust (which owns 25% of HMA), Elliott Gorog received distributions from the trust that were directly traceable to customer contributions fraudulently diverted from HMA.

293. The systematic nature of these benefits—occurring daily through the documented transfers—establishes that the fraud was not merely a corporate failing but was specifically designed to generate personal wealth for Elliott Gorog. See *Lone Star Air*, 401 S.W.3d at 866 (personal benefit must be direct and substantial).

**Regina Gorog's Direct Personal Benefit**

294. Regina Gorog personally received substantial direct financial benefits from the fraud:

a) **Personal luxury expenses:** Regina Gorog used HMA funds for personal leisure travel, food, entertainment, and other personal expenses totaling hundreds of thousands of dollars.

b) **Beachfront condominium:** Regina Gorog used HMA funds to pay rent on a beachfront condominium she maintained with Elliott for substantial personal use.

c) **Control over cash distributions:** As sole signatory on HMA's primary bank account, Regina had exclusive power to direct funds to herself and her family members. Upon information and belief, Regina caused substantial transfers from HMA to accounts she controlled personally.

d) **Daily cash sweeps:** Upon information and belief, Regina Gorog personally received portions of the systematic daily transfers documented by Shelton, which she authorized in her capacity as sole signatory on the source account.

e) **Trust distributions:** As trustee and beneficiary of the Regina Kathryn Gorog Trust (which owns 25% of HMA), Regina received distributions from the trust directly traceable to customer contributions fraudulently diverted from HMA while HMA was insolvent.

**2) Garland Levit's Direct Personal Benefit**

3) Garland Levit personally received substantial direct financial benefits from the fraud:

a) **Trust distributions:** As trustee of both the Garland Levit 2011 Irrevocable Trust and the Donald N. Levit 2010 Descendants Trust (which together own 50% of HMA), Garland Levit received or authorized distributions from these trusts directly traceable to customer contributions fraudulently diverted from HMA.

b) **Payments to controlled entities:** Upon information and belief, Garland Levit received personal payments through entities he controls, including Think Wellness Now, Inc.,

Health Maintenance Plus Agency, Inc., and Agents Commission Advance Association, LLC, which received fraudulent transfers from HMA.

c) **Direct involvement in founding fraud:** Elliott Gorog's December 9, 2023 reference to the "Donzi scheme in loving memory of Don" indicates that Garland Levit and his father Don Levit were instrumental in designing HMA's fraudulent business model from inception, and Garland personally benefited from this design.

295. Upon information and belief, Garland Levit received substantial personal monetary benefit through his roles as officer, co-founder, and controlling trustee of trusts owning 50% of HMA.

**Causation: Fraud Directly Generated Personal Wealth**

296. The causal link between the fraud and the officers' personal enrichment is direct and undeniable:

a) Customer contributions flowed into HMA's accounts based on false promises of matching funds and accessible accounts.

b) The officer defendants caused these funds to be transferred daily ($27,000-$50,000 per day) to accounts they controlled.

c) The officer defendants used these funds for personal expenses and trust distributions.

d) This is precisely the kind of asset-stripping fraud that Texas law targets through officer liability—using a corporate shell to perpetrate fraud while personally pocketing the proceeds.

297. The officer defendants cannot claim that HMA's insolvency was simply a business failure. The fraud was specifically designed to generate personal wealth for the officers while leaving HMA as an empty shell unable to satisfy customer claims. The

systematic daily transfers occurred while HMA held less than 4% of its obligations—demonstrating that personal enrichment, not corporate solvency, was the primary purpose.

**ELEMENT FOUR: CAUSATION AND INJURY**

298. Plaintiff and Class members were injured precisely because the officer defendants diverted HMA's assets—which should have funded customer accounts—for their personal benefit.

**Direct Causal Link**

299. The customers' injuries were directly caused by the officers' fraudulent conduct:

a) Customers made contributions based on false promises of matching funds signed by Regina Gorog.

b) These contributions flowed into accounts controlled exclusively by Regina and Elliott Gorog.

c) Instead of maintaining these funds to honor customer accounts, the officer defendants transferred the funds daily to accounts for their personal benefit.

300. As a direct result, when customers submitted legitimate claims, HMA had insufficient funds to pay because the officers had diverted the funds for personal use.

301. This causal chain is far stronger than cases where officer liability was denied because there was no showing of asset diversion. Here, Hollie Shelton's testimony provides direct evidence of systematic daily asset transfers for the officers' benefit occurring contemporaneously with HMA's failure to pay customer claims.

302. The injury to customers is quantifiable and substantial:

a) **Total customer account balances:** Over $38 million as of February 2024.

b) **Actual funds held by HMA:** Less than $1.4 million (less than 4% of obligations).

c) **Shortfall:** Over $37 million in customer funds that were diverted rather than maintained.

d) **Daily transfers for officers' benefit:** Approximately $10.5 million transferred October 2023-August 2024 (calculated conservatively at $35,000/day × 300 days).

303. This is not a case of corporate insolvency due to market forces or business failure. The insolvency was created deliberately by the officer defendants' systematic diversion of customer funds for personal benefit.

**ELEMENT FIVE: STANDING**

304. Plaintiff and the Class have standing to bring this veil-piercing claim against the officer defendants.

305. HMA is not currently in bankruptcy or receivership. Under Texas law, individual creditors have standing to pursue alter-ego and veil-piercing claims when the corporation is not in bankruptcy.

306. If HMA subsequently files bankruptcy or a receiver is appointed, only the bankruptcy estate or receiver would have standing to pursue these claims. However, as of the filing of this Complaint, no bankruptcy or receivership proceeding has been commenced, and Plaintiff has standing to pursue officer liability on behalf of the Class.

307. The officer defendants' conduct satisfies every element required under Texas Bus. Orgs. Code § 21.223(b) for holding officers personally liable:

a) **Unity of interest and control:** The officer defendants exercised total control over HMA's finances through their roles as sole signatories on bank accounts, their dual roles as officers and beneficial owners through trusts, and their complete disregard for corporate formalities.

b) **Actual fraud:** The officer defendants committed actual fraud by operating an admitted Ponzi scheme, making knowing false representations in contracts signed by Regina

Gorog, directing systematic customer deception, and implementing the "pocket the savings" scheme—all involving intentional deception designed to mislead customers.

c) **Direct personal benefit:** The officer defendants personally received millions of dollars in direct benefits through personal luxury expenses, daily cash sweeps totaling approximately $10.5 million, and trust distributions directly traceable to fraudulently diverted customer funds.

d) **Causation:** Customers were injured precisely because the officer defendants diverted customer funds that should have funded their accounts, creating a direct causal link between the fraud and the injuries.

e) **Standing:** HMA is not in bankruptcy, so Plaintiff has standing to pursue this claim.

308. If Plaintiff provides evidence supporting these specific allegations at trial, Texas law permits veil-piercing under § 21.223(b) and allows direct judgment against Elliott Gorog, Regina Gorog, and Garland Levit personally.

309. This is precisely the conduct that Texas Bus. Orgs. Code § 21.223(b) was designed to remedy.

**COUNT 7: CONSTRUCTIVE TRUST** (On Behalf of Plaintiff and the Class v. All Defendants)

310. Paragraphs 1-249 are incorporated by reference.

311. Defendants hold assets that rightfully belong to Plaintiff and Class members, including: (a) funds transferred from HMA to individual defendants for personal use; (b) funds transferred to trust defendants; (c) funds transferred to entity defendants; (d) any assets purchased with customer funds.

312. Defendants obtained these assets through fraud, breach of fiduciary duty, and unjust enrichment.

313. Equity requires that defendants hold these assets in constructive trust for the benefit of Plaintiff and Class members.

314. Plaintiff requests that the Court: (a) impose constructive trust on all assets held by defendants derived from customer funds; (b) order disgorgement; (c) appoint a receiver to administer the trust assets.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

**A. CERTIFICATION:**

1. Certify this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3);

2. Appoint Plaintiff as Class Representative;

3. Appoint Plaintiff's counsel as Class Counsel;

**B. DECLARATORY RELIEF:**

4. Declare that Defendants have engaged in the wrongful conduct alleged herein;

5. Declare that Defendants breached their contracts with Plaintiff and the Class;

6. Declare that Defendants violated the Texas DTPA;

7. Declare that all transfers from HMA to defendant transferees are void under TUFTA;

**C. DAMAGES:**

8. Award Plaintiff and the Class compensatory damages in an amount to be proven at trial;

9. Award Plaintiff and the Class treble damages under the Texas DTPA pursuant to Tex. Bus. & Com. Code § 17.50(b)(1);

10. Award Plaintiff and the Class benefit of the bargain damages for the promised but never-provided matching funds;

11. Award Plaintiff and the Class incidental and consequential damages;

12. Award Plaintiff and the Class mental anguish damages;

13. Award Plaintiff and the Class prejudgment and post-judgment interest at the maximum rate allowed by law;

**D. RESTITUTION AND DISGORGEMENT:**

14. Order rescission of all contracts with HMA under the DTPA pursuant to Tex. Bus. & Com. Code § 17.50(b)(1);

15. Order restitution of all amounts paid to HMA, including all customer contributions and monthly maintenance fees;

16. Order disgorgement of all fraudulently transferred assets from all transferee defendants;

17. Order disgorgement of more than $20,000,000 in customer funds that Defendants improperly confiscated from customer accounts;

**E. FRAUDULENT TRANSFER RELIEF:**

18. Enter judgment requiring all transferee defendants to return all fraudulently transferred assets or pay their value to Plaintiff and the Class;

19. Impose a constructive trust on all assets transferred from HMA to defendant transferees;

20. Order a complete accounting of all transfers from HMA to all defendant transferees;

21. Award reasonable attorney's fees and costs under TUFTA § 24.010(a);

**F. VEIL PIERCING:**

22. Pierce the corporate veil and hold the trust defendants personally and jointly and severally liable for all obligations of HMA to Plaintiff and the Class;

23. Disregard the separate legal existence of HMA and the trusts for purposes of satisfying all judgments;

24. Enter judgment against the trust defendants for all damages awarded in this action;

**G. INJUNCTIVE RELIEF:**

25. Enjoin HMA and all individual defendants from continuing to solicit new customers;

26. Enjoin HMA and all defendants from making any further transfers of assets;

27. Enjoin HMA and all defendants from dissipating, transferring, or encumbering any assets;

28. Require HMA and all defendants to provide a complete accounting of all customer funds;

29. Appoint a receiver to take possession of HMA's assets, marshal estate assets, pursue fraudulent transfer recovery actions, and ensure equitable distribution to Class members;

30. Enter injunctive relief under the DTPA pursuant to Tex. Bus. & Com. Code § 17.50(b)(2);

**H. ATTORNEY'S FEES AND COSTS:**

31. Award reasonable and necessary attorney's fees under the DTPA pursuant to Tex. Bus. & Com. Code § 17.50(d);

32. Award reasonable attorney's fees under TUFTA § 24.010(a);

33. Award court costs and expenses of litigation;

**I. JOINT AND SEVERAL LIABILITY:**

34. Enter judgment that all defendants are jointly and severally liable for all damages awarded;

**J. ADDITIONAL RELIEF:**

35. Award punitive or exemplary damages to the extent permitted by law;

36. Award such other and further relief as this Court deems just, proper, and equitable.

**VIII. DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all triable issues.

Dated: November 11, 2025

Respectfully submitted,

ALEXANDER LOFTUS, Esq.
SDTX Federal No. 3663102
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60601
Ph: 312.899.6625
alex@loftusandeisenberg.com
- and -

JAMES CREWSE, Esq.
Texas Bar No. 24045722
CREWSE LAW FIRM, PLLC
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com

ATTORNEYS FOR PLAINTIFF
AND THE PROPOSED CLASS